The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 9, 2020

## 2020COA62

**No. 16CA0244, *People v. Ornelas-Licano* — Crimes — Criminal Attempt — Murder in the Second Degree — First Degree Assault — Extreme Indifference; Colorado Constitution — Equal Protection; Evidence — Testimony by Experts**

This is an appeal from a criminal conviction for second degree murder. On appeal, the defendant contends that his conviction violates equal protection guarantees because attempted second degree murder is indistinguishable from the lesser offense of attempted first degree assault – extreme indifference. He also argues that the trial court abused its discretion by admitting expert testimony of a police officer analyzing the shape of a bullet hole in a windshield to determine where the shot came from.

A division of the court of appeals unanimously rejects defendant's equal protection challenge, concluding that the conduct proscribed by the second degree murder statute and first degree

assault – extreme indifference statute is distinguishable for equal protection purposes. The division, with one judge dissenting, also concludes that the trial court abused its discretion by admitting the officer's expert testimony because his experience did not qualify him to opine on the relationship between the angle of impact and shape of the bullet hole, and there is nothing in the record beyond the officer's own assertions to show that someone can determine from the shape of a bullet hole in a windshield where the bullet came from. Because the majority of the division concludes this error was not harmless, it reverses.

COLORADO COURT OF APPEALS                                    **2020COA62**

Court of Appeals No. 16CA0244
Larimer County District Court No. 14CR1760
Honorable Stephen J. Schapanksi, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jose Ornelas-Licano,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE WELLING
Martinez*, J., concurs
Berger, J., concurs in part and dissents in part

Announced April 9, 2020

Philip J. Weiser, Attorney General, John T. Lee, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, James S. Hardy, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1    Defendant, Jose Ornelas-Licano, appeals his conviction for attempted second degree murder.  He argues that his conviction violates equal protection guarantees because attempted second degree murder is indistinguishable from the lesser offense of attempted first degree assault – extreme indifference.  He also argues that the trial court abused its discretion by admitting expert testimony of a police officer analyzing the shape of a bullet hole in a windshield to determine where the shot came from.

¶ 2    We first conclude that the conduct proscribed by the second degree murder statute and first degree assault – extreme indifference statute is distinguishable for equal protection purposes.  We next conclude that the trial court abused its discretion by admitting the officer's expert testimony because his experience did not qualify him to opine on the relationship between the angle of impact and shape of the bullet hole, and there is nothing in the record beyond the officer's own assertions to show that someone can determine from the shape of a bullet hole in a windshield where the bullet came from.  Because this error was not harmless, we reverse.

## I.    Relevant Facts and Procedural History

¶ 3    For reasons not pertinent to this appeal, a warrant was issued for Ornelas-Licano's arrest. An officer driving an unmarked vehicle located Ornelas-Licano in his pickup truck parked in a driveway. The officer called for backup because he had been told that Ornelas-Licano might be armed. More officers arrived in their vehicles, turned on their emergency lights, and pulled up near Ornelas-Licano's truck.

¶ 4    The officers got out and, with their guns drawn, commanded Ornelas-Licano to put his hands up and shut off the truck. Ornelas-Licano initially complied with the officers' commands, but ultimately put the truck in gear and fled the scene. A chase ensued.

¶ 5    During the chase, Ornelas-Licano approached a marked police vehicle at an intersection. As the vehicles drew closer, a shot went off inside Ornelas-Licano's truck, resulting in a bullet hole in his truck's windshield. No one was hit, and the chase continued.

¶ 6    Ornelas-Licano eventually ran into another car, abandoned his truck and his gun, and fled on foot. Police ultimately apprehended him without further incident.

¶ 7    After his arrest, Ornelas-Licano claimed that he had fired the gun accidentally while operating the stick shift for the truck's manual transmission.  The prosecutor did not credit this account and charged him with attempted first degree murder of the officer in the vehicle at the intersection and the lesser included offenses of attempted second degree murder and attempted first degree assault – extreme indifference.  He was also charged with eluding police, leaving the scene of an accident, and other crimes.

¶ 8    At trial, Ornelas-Licano argued that he was not guilty of attempted murder or attempted assault because he had fired the gun accidentally.  In other words, because the gunshot was the result of an accidental discharge, he acted without the requisite intent to commit either attempted murder or attempted assault. Ornelas-Licano's lawyer told the jury that he was not contesting the other charges.

¶ 9    The prosecutor argued that Ornelas-Licano had intentionally pointed the gun at the officer in the police vehicle and fired.  A police officer, qualified as an expert, testified that, based on the shape of the bullet hole in the truck's windshield, the shot had been

fired from shoulder height, rather than from below the dash, near the stick shift, as Ornelas-Licano had claimed.

¶ 10 To rebut this testimony, Ornelas-Licano called his own expert witness, who testified that there were too many variables in play to conclude, based on either the shape of the bullet hole in the windshield or the experiment the prosecution expert conducted, that the shot had come from shoulder height, rather than below the dash.

¶ 11 A jury convicted Ornelas-Licano of attempted second degree murder, eluding police, reckless driving, leaving the scene of an accident, possession of a defaced firearm, and prohibited use of a weapon, and the trial court sentenced him accordingly. Ornelas-Licano appeals only the conviction for attempted second degree murder.

II.   Ornelas-Licano's Equal Protection Claim Is Without Merit

¶ 12 Ornelas-Licano first contends that his conviction for attempted second degree murder violates equal protection guarantees because

it requires a harsher punishment than, but is indistinguishable from, first degree assault – extreme indifference.[1]  We disagree.

A.  Standard of Review and Applicable Law

¶ 13  We review de novo the constitutionality of a statute.  *Dean v. People*, 2016 CO 14, ¶ 8.  A statute is presumed to be constitutional, and the challenging party bears a heavy burden to demonstrate its unconstitutionality.  *Id.*

¶ 14  "When two criminal statutes prescribe different penalties for identical conduct, a defendant is denied equal protection under the laws if he is convicted under the harsher statute."  *People v. Griego*, 2018 CO 5, ¶ 35.  "Similarly, when separate statutes prescribe different penalties for what ostensibly might be different acts but offer no intelligent standard for distinguishing between and among these acts, those statutes deny equal protection under the law."  *Id.*

---

[1] The United States Supreme Court has rejected this argument under the United States Constitution.  *United States v. Batchelder*, 442 U.S. 114, 125 (1979).  But the Colorado Supreme Court has held that this claim is cognizable under the equal protection guarantees of the Colorado Constitution.  *People v. Marcy*, 628 P.2d 69 (Colo. 1981).  Although Colorado's constitution does not include an equal protection clause, the Colorado Supreme Court has "construe[d] the due process clause of the Colorado Constitution to imply a similar guarantee."  *Dean v. People*, 2016 CO 14, ¶ 11.

Distinctions between the two offenses "must turn on 'reasonably intelligible standards of criminal culpability,' and any definition of a crime must be 'sufficiently coherent and discrete that a person of average intelligence can reasonably distinguish it from conduct proscribed by other offenses.'" *Id.* at ¶ 36 (quoting *People v. Marcy*, 628 P.2d 69, 80-81 (Colo. 1981)).

¶ 15    A person commits second degree murder if "the person knowingly causes the death of a person." § 18-3-103(1), C.R.S. 2019. To satisfy the "knowingly" requirement, the person must be aware that his or her conduct is "practically certain" to cause the death of another person. § 18-1-501(6), C.R.S. 2019.

¶ 16    A person commits first degree assault - extreme indifference if that person

(1)    "[u]nder circumstances manifesting extreme indifference to the value of human life,"

(2)    "knowingly engages in conduct which creates a grave risk of death to another person," and

(3)    "thereby causes serious bodily injury to any person."

§ 18-3-202(1)(c), C.R.S. 2019.

¶ 17    An attempt occurs when a person "acting with the kind of culpability otherwise required for commission of [the] offense . . . engages in conduct constituting a substantial step toward the commission of the offense." § 18-2-101(1), C.R.S. 2019.

### B.    Attempted Second Degree Murder Is Distinguishable from Attempted First Degree Assault - Extreme Indifference

¶ 18    Looking to the plain language of the statutes, we conclude that they do not proscribe the same conduct.

¶ 19    Attempted second degree murder requires a substantial step toward causing death, while attempted first degree assault – extreme indifference requires only a substantial step toward causing serious bodily injury.  § 18-2-101(1); § 18-3-103; § 18-3-202(1)(c).

¶ 20    *People v. Castro*, 657 P.2d 932, 940-41 (Colo. 1983), *overruled on other grounds by West v. People*, 2015 CO 5, ¶¶ 29, 64, 70, highlights the importance of this distinction.  In that case, the supreme court considered whether the alleged overlap between the crimes of attempted first degree extreme indifference murder and first degree assault violated equal protection guarantees.  *Id.*  The court concluded the conduct proscribed by the statutes was

7

distinguishable, in part because attempted murder requires "a substantial step towards the causation of another's death," and first degree assault does not. *Id.* at 941.

¶ 21 The same distinction applies here when we compare attempted second degree murder and attempted first degree assault – extreme in-difference: only one requires a substantial step toward the causation of another's death. Therefore, the statutes do not proscribe the same conduct, and the equal protection claim fails.

¶ 22 Even though this analysis is sufficient to reject Ornelas-Licano's equal protection argument, we briefly address his contention that *Marcy*, 628 P.2d at 78, requires a different result.

¶ 23 Attempted second degree murder requires conduct practically certain to result in death, while attempted first degree assault – extreme indifference requires conduct that creates a grave risk of death. §§ 18-3-103, -202(1)(c). Ornelas-Licano argues that, under *Marcy*, 628 P.2d at 78, these standards proscribe the same conduct. But *Marcy* is distinguishable. Moreover, *Marcy* was superseded by statute, Ch. 212, sec. 4, § 18-3-102, 1981 Colo. Sess. Laws 973, as recognized in *People v. Jefferson*, 748 P.2d 1223, 1223-24 (Colo. 1988).

¶ 24    In *Marcy*, 628 P.2d at 79-80, the court held that first degree murder – extreme indifference was indistinguishable from the lesser offense of second degree murder for equal protection purposes, in part because the conduct proscribed by the greater offense (conduct practically certain to cause death) necessarily included the conduct proscribed by the lesser offense (conduct creating a grave risk of death).[2]

¶ 25    In this case, we are faced with the converse.  And we conclude that, while conduct practically certain to cause death necessarily includes conduct creating a grave risk of death, conduct creating a grave risk of death does not necessarily include conduct practically certain to cause death.

¶ 26    *People v. Rubio*, 222 P.3d 355 (Colo. App. 2009), illustrates this distinction well, and we follow its reasoning here.  In that case, the defendant "used an AK-47 assault rifle to shoot repeatedly at an empty car parked outside a Denver residence" following a dispute with a woman inside the residence.  *Id.* at 358.  His "wild shots blew

---

[2] *Montoya v. People*, 2017 CO 40, relied on this reasoning in *People v. Marcy*, 628 P.2d 69, 78 (Colo. 1981), to make a similar observation and is, therefore, distinguishable for the same reasons.

holes not only in the car but also in two nearby residences," injuring two girls. *Id.* He was convicted of multiple counts of attempted extreme indifference murder. *Id.*

¶ 27 On appeal, the division "reject[ed] defendant's contention that the prosecution [had to] prove he knew his actions were 'practically certain' to cause death," concluding that the prosecutor needed only to prove that the defendant "engaged in depraved conduct that in fact created a grave risk of death." *Id.* at 359. So, while the *Rubio* defendant's actions created a grave risk of harm, they were not practically certain to result in death. Conduct practically certain to result in death requires a greater likelihood of the negative outcome, and the identified negative outcome is more severe, justifying the greater punishment for that conduct.

¶ 28 For these reasons, we conclude that the conduct proscribed by the second degree murder statute is reasonably distinguishable from that proscribed by the first degree assault – extreme indifference statute. It, therefore, follows that Ornelas-Licano's attempted second degree murder conviction does not violate equal protection guarantees.

### III. The Officer's Testimony Interpreting the Shape of the Bullet Hole in the Windshield and Evidence of the Windshield Experiment Were Improperly Admitted

¶ 29 Ornelas-Licano next contends that the trial court abused its discretion by admitting (1) testimony from Inspector Daniel Gilliam, the prosecution's expert, that, based on his experience and the windshield experiment he had conducted, the elliptical shape of the bullet hole was more consistent with a shot fired from shoulder height than with a shot fired at the stick shift level; and (2) evidence of the results of the windshield experiment. We agree.

#### A. Additional Factual Background

¶ 30 Approximately ten months before trial, Inspector Gilliam, along with the detective assigned to the case, inspected the bullet hole in the front windshield of Ornelas-Licano's truck. Based on the elliptical shape of the hole, Inspector Gilliam hypothesized that the shot had been fired from a "normal" shooting position (i.e., shoulder height) and not from near the stick shift (which would be consistent with an accidental discharge).

¶ 31 To test his hypothesis, Inspector Gilliam developed an experiment. He obtained two new windshields that were the same type as the one in Ornelas-Licano's truck. He fired Ornelas-

11

Licano's gun through one of the windshields at approximately the same angle as a shot fired from the level of the truck's stick shift. He then fired the gun through the other windshield at approximately the same angle as a shoulder-height shot. From these two data points, he opined that the "basic shape" of the bullet hole from the shoulder-height test shot was the "same" as the shape of the bullet hole in Ornelas-Licano's windshield.

¶ 32    The People endorsed Inspector Gilliam as an expert witness. The evening before he was scheduled to testify, Ornelas-Licano objected to his qualifications and requested a hearing pursuant to *People v. Shreck*, 22 P.3d 68 (Colo. 2001). The following morning, before the jury was called to the courtroom to begin the day, the trial court conducted a *Shreck* hearing.

¶ 33    At the *Shreck* hearing, Inspector Gilliam testified about his training and experience, as well as the windshield test he had performed. There was no dispute that Inspector Gilliam was an abundantly qualified firearms expert. He testified that he

- has worked with firearms for thirty-six years;
- was a member of the SWAT team for six years, which included "heavy firearms training";

12

- is a firearm and toolmark examiner; and

- shoots guns on an almost daily basis.

¶ 34     Inspector Gilliam also testified that the experiment he performed — the windshield test — was based on "the science of terminal ballistics."  Terminal ballistics, according to Inspector Gilliam, is the study of "how th[e] bullet reacts [with] whatever target it strikes."  Inspector Gilliam's training and experience in terminal ballistics focused on three specific areas.  First, because he "investigate[s] crime scenes and do[es] autopsies," he routinely sees "what a bullet does upon impact" with various barriers, including human tissue, glass, walls, and cinderblock.  Second, as a sniper, he "studied . . . very closely" what bullets "reacted best" through various barriers, including glass.  Third, also based on his experience as a sniper, he studied how the trajectory of a bullet fired through glass would change based on the type of glass and angle of impact.

¶ 35     None of this training or experience, however, focused on the relationship between the angle of a bullet's impact and the shape of the resulting hole.  Indeed, on cross-examination during the *Shreck* hearing, Inspector Gilliam testified as follows:

13

Q. . . . But you were not being trained on the appearance of bullet holes in glass based on different firing locations, correct?

A. No. It was just an observation that every time we shot glass, we would look at the holes and so we knew which angles we had shot at and we could see the shape of the hole, whether it be glass, tempered glass, or laminated.

Q. Okay. *And so your observations of the bullet holes in laminated glass, that's not really based on specialized training as much as it is anecdotal experience, true?*

A. *True.* And that was in the effect of what we were accomplishing.

(Emphasis added.)

¶ 36    Near the close of the *Shreck* hearing, Inspector Gilliam said that the opinion he would offer at trial, based on his observations and the windshield experiment, would be that the gun "was probably held at a shoulder height and shot straight . . . towards the windshield."

¶ 37    The nature of Ornelas-Licano's objection to Inspector Gilliam's testimony was not that he wasn't a firearms expert. Indeed, everyone agreed he was. Instead, Ornelas-Licano's objection was that Inspector Gilliam's methodology wasn't reliable and that he wasn't qualified in the relevant field of terminal ballistics —

14

specifically, in determining the angle of impact of a bullet from the shape of a bullet hole.

¶ 38    The trial court disagreed, ruling that Inspector Gillam would be permitted to testify as an expert.  With respect to reliability, the court determined, "The defense has argued that the scientific principles involved here are unreliable.  I don't agree.  I mean, ballistics, as described by the witness, the three aspects of it, is not unreliable scientific evidence."

¶ 39    And with respect to the witness's qualifications, the court found:

> The Court finds he is qualified.  There's a lot of ways that an expert may be qualified.  It does not necessarily require that you have a physics degree.  It does not -- it is knowledge, skill, experience, training, or education.  This witness has a lot of experience.  He has some training that is, *if not precisely on this issue, certainly related to this issue,* 40 hours of training that included some firing through glass and so forth.

(Emphasis added.)

¶ 40    Inspector Gilliam then testified as an expert in front of the jury.  He testified about the windshield test, and photographs of the test bullet holes and the actual bullet hole were shown to the jury.

15

Inspector Gilliam ultimately opined that the shot that pierced the truck's windshield came "[f]rom closer to the natural shooting position," and not from near the stick shift.

### B. Preservation and Legal Principles

¶ 41 The Attorney General concedes, and we agree, that Ornelas-Licano preserved his objection to Inspector Gilliam offering his expert opinion or testifying regarding the windshield experiment.

¶ 42 "The trial court has broad discretion to determine the admissibility of expert testimony." *Golob v. People*, 180 P.3d 1006, 1011 (Colo. 2008). "We will not overturn its decision unless it is 'manifestly erroneous.'" *Id.* (quoting *People v. Ramirez*, 155 P.3d 371, 380 (Colo. 2007)).

¶ 43 CRE 702 and CRE 403 govern the admissibility of all expert testimony in this jurisdiction. *Kutzly v. People*, 2019 CO 55, ¶ 10; *Ruibal v. People*, 2018 CO 93, ¶ 12. Under CRE 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The expert testimony must be reliable and relevant,

and its probative value must not be substantially outweighed by any of the countervailing considerations listed in CRE 403. *Kutzly*, ¶ 10. "Determining if expert testimony is reasonably reliable requires considering the totality of the circumstances surrounding the proposed expert testimony and is not contingent on any specific list of factors." *Id.* at ¶ 12 ("[C]ertain factors — such as whether the technique has been tested, whether it has been subjected to peer review and publication, whether it has been generally accepted, its known or potential rate of error, and the existence and maintenance of standards controlling its operation — will be crucial in some cases but inapposite in others."). And "a trial court's reliability determination should consider whether the witness is qualified as an expert regarding the proposed testimony." *Id.*

¶ 44    Though CRE 702 and Fed. R. Evid. 702 differ in some respects, case law interpreting both rules emphasizes that the principles and methodology underlying expert testimony must be reliable. *E.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-58

(1999);[3] *Ruibal*, ¶¶ 12-16.  Accordingly, analysis under Fed. R. Evid.

702 informs our analysis here.

> In the typical case, the proponent invites the
> expert to describe a general technique or
> theory and then apply to the technique or
> theory to the specific facts of the case.  In
> essence, the balance of the expert's testimony
> is a syllogism: The major premise is the
> validity of the expert's general theory or
> technique, the minor premise is the case
> specific data, and the application of major to
> minor yields a conclusion relevant to the
> merits of the case. . . .
>
> . . . .
>
> . . . [When an] expert is making an inferential
> claim, a foundation merely showing the
> expert's experience is inadequate.  The judge
> should insist on a foundation demonstrating
> that the expert's technique . . . "works"; that
> is, it enables the expert to accurately make the
> determination as to which he or she proposes
> to testify.  The foundation must include a
> showing of the results when the technique was
> used on prior occasions.  Do the outcomes
> demonstrate a connection between facts *A* and
> *B*?  Neither the expert's personal voucher nor
> general acceptance in the field nor even long-
> term, repeated use of the theory suffices.

---

[3] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), served as one
of the bases for the amendments to Fed. R. Evid. 702 that
differentiate it from CRE 702.  *See* Fed. R. Evid. 702 advisory
committee's note to 2000 amendments.

1 *McCormick on Evidence* § 13 (Kenneth S. Broun ed., 7th ed. 2013) (footnote omitted).

### C. Analysis

¶ 45 The underlying premise of both Inspector Gilliam's opinion testimony and the windshield test is that there is a nonrandom correlation between the shape of a bullet hole in a windshield and the angle of impact of the bullet. If there is no such correlation, meaning that it is a random occurrence that a particular shape of bullet hole is caused by a particular angle of impact, neither Inspector Gilliam's testimony nor the windshield test has any probative value. Ornelas-Licano challenged both (1) the qualifications of Inspector Gilliam to render his opinion and (2) the reliability of the methodology he used to reach his opinion. We conclude that the trial court abused its discretion by permitting Inspector Gilliam to testify as an expert on the relationship between the shape of a bullet hole and where the shot came from, as well as the results of his windshield test.

¶ 46 Aside from Inspector Gilliam's own hypothesis, the record is *devoid of any showing* that the shape of a bullet hole in a windshield is demonstrative or indicative of the angle at which the

bullet struck the glass. Inspector Gilliam purported to be able to apply a technique to determine, based on the shape of a bullet hole, where the bullet came from, but there was no showing that the technique "works." *See McCormick on Evidence* § 13.

¶ 47 The prosecutor presented no evidence, either through Inspector Gilliam or otherwise, that anyone other than Inspector Gilliam himself had previously analyzed the relationship between the shape of a bullet hole in laminated glass and the angle of impact. No evidence was presented that the existence of such a relationship had been subject to peer review or was scientifically sound or generally accepted. *Estate of Ford v. Eicher*, 250 P.3d 262, 267 (Colo. 2011); *Ramirez*, 155 P.3d at 378-79. Inspector Gilliam never testified that he or anyone else had conducted this type of analysis before, much less described the results from when this technique had been applied in the past.[4]

---

[4] When asked during the *Shreck* hearing whether he had "ever done a test like this before," Inspector Gilliam responded, "If I have, I don't recall." At trial, he was asked "would it be fair to say that this is the first time that you have conducted a test in order to determine the angle of impact of a windshield -- angle of impact of a bullet going through a windshield?" To that question, he responded, "It is."

¶ 48    While Inspector Gilliam testified that he had extensive experience in shooting through various windshields, indeed had done so more than one hundred times, all of that experience was in the context of determining the effect the windshield had on the bullet and its trajectory after it passed through the glass, not to analyze the relationship between the angle of impact and the shape of the bullet hole.[5]

---

[5] At trial, Inspector Gilliam testified as follows:

> Q. . . . You talked about the training that you
> did with the SWAT group regarding shooting
> through glass.  Do you recall that?
>
> A.  I do.
>
> Q.  And the primary focus of that training was
> teaching an individual how to shoot through
> glass and what happens to a bullet when it
> hits glass; is that fair to say?
>
> A.  Correct.
>
> . . . .
>
> Q. . . . But no part of that training was devoted
> to studying bullet holes to determine an angle
> of impact?
>
> A.  No.

¶ 49    In response to the question, "In your training and experience, what does an elliptical hole indicate?" Inspector Gilliam testified that "in firearms or bloodstain, it indicates that it's been deposited at an angle." Similarly, in a report that wasn't offered or presented to the jury, but was received and considered by the court during the *Shreck* hearing, Inspector Gilliam stated that "[f]rom previous experience and testing of shots through a windshield, an elliptical hole indicate[s] that the bullet has struck the windshield at an angle other than perpendicular."

¶ 50    These statements are insufficient to establish reliability under CRE 702. Inspector Gilliam did not describe the methodology underlying the "testing of shots through a windshield," the purpose of that testing, the analysis conducted, or the results of that testing beyond his conclusion that shots fired at an angle produce elliptical bullet holes. And the statements do nothing to establish that he or anyone else can reliably apply his theory to interpret the shape of the bullet hole in this case.

¶ 51    The absence of that foundational testimony is fatal to the admission of this testimony.[6]  Nothing supported Inspector Gilliam's opinion or the implicit reliability of the experiment other than his own "bare assertions." *Ramirez*, 155 P.3d at 379; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").

¶ 52    Colorado case law further supports this conclusion.  In *Brooks v. People*, 975 P.2d 1105 (Colo. 1999), the court considered whether, under CRE 702 and CRE 403, to admit testimony from a police dog handler that the dog had identified the defendant as the person who had left the tracks from the scene of the crime.  Before this testimony could be admitted, the court required a showing that the dog was "of a breed characterized by acute power of scent," the dog had been "trained to follow a track by scent," the dog had been

---

[6] We do not address whether this type of expert testimony or the windshield test may be admissible under CRE 702 and CRE 403 with greater record support.  If it is potentially admissible, we do not address what specific showing must be made to support its admission.  The trial court has wide discretion to make such determinations regarding the admission of expert testimony. *Golob v. People*, 180 P.3d 1006, 1011 (Colo. 2008).

"found by experience to be reliable in pursuing human tracks," the dog had been "placed on the trail where the [defendant] was known to have been," and the "tracking efforts took place within a reasonable time, given the abilities of the animal." *Id.* at 1114.

¶ 53 In short, the court required an extensive foundation to support the prosecutor's claim that the dog was capable of identifying a perpetrator by scent and that the dog had reliably done so in this case. Here, we have no showing, beyond Inspector Gilliam's own self-vouching, that someone can analyze the shape of a bullet hole to determine where the shot came from or that he reliably applied that technique in this case.

¶ 54 Similarly, the Colorado Supreme Court has excluded, under CRE 702 and CRE 403, expert testimony of a detective describing the profile of a drug courier and concluding that the defendant was a drug courier. *Salcedo v. People*, 999 P.2d 833 (Colo. 2000). The court concluded that this testimony was inadmissible because of the "lack of evidence indicating that [the detective] utilized an objective, widely recognized profile" and the "lack of evidence . . . indicating that conformity to [the detective's] drug courier profile is a reliable indicator of guilt." *Id.* at 839. In this case, there is no

showing that the expert's method is "widely recognized" or "objective" or that it can reliably determine the angle of impact.

¶ 55     And more recently, in *Ruibal,* 2018 CO 93, the Colorado Supreme Court excluded expert testimony based on the theory of "overkill" that the assailant in that case had an emotional connection with the victim.  The court stated that "the record was virtually devoid of support[] concerning the reliability of the scientific principles underlying the theory and interpretation of 'overkill.'"  *Id.* at ¶ 15.

> The witness relied on a single treatise as support for the theory of "overkill," which even he did not accept as generally authoritative, and which, in any event, defined "overkill" far too narrowly . . . to support the essential inference, drawn by the expert in this case, of an emotional relationship between the victim and killer.  Similarly, although the witness testified that he had performed many autopsies himself and knew "who confessed to doing what," he failed to offer even anecdotal, much less empirical, evidence supporting his conclusion that beatings like the one in this case were likely committed by someone with an emotional connection to the victim.  Finally, neither the appellate courts of this jurisdiction nor those of any other jurisdiction have yet accepted as reliable the theory or interpretation of "overkill" advanced by the witness.

*Id.* (footnote omitted).

¶ 56    In sum, the Colorado Supreme Court has consistently required more than the expert's own assertions to support the required finding that the expert's underlying theory is reliable. That showing was not made in this case.[7] *Cf. United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (concluding that because the putative expert "was relying solely or primarily on his experience, it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case").

---

[7] Though not relied on by either party, we note that *People v. Caldwell*, 43 P.3d 663, 667 (Colo. App. 2001), does not support a different result. In that case, the division observed that "[n]o special expertise is required to look at the hole made by the bullet and realize that it followed a straight-line path." *Id.* In *Caldwell*, a former police officer used string to track the paths of bullets through a car and testified about their trajectories on that basis. *Id.* There, the evidence established multiple points along the bullets' paths, which the witness used to establish their trajectories. Here, the evidence established only one point in the bullet's path — the hole in the windshield. The testimony in *Caldwell* was based on the bullets' paths, not the shape of the bullet holes. Accordingly, *Caldwell* does not inform our analysis.

¶ 57    The Sixth Circuit has developed a useful framework for evaluating the reliability of an expert's opinion, explaining that there are a number of "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).  These red flags include (1) "reliance on anecdotal evidence"; (2) "improper extrapolation"; (3) "failure to consider other possible causes"; (4) "lack of testing"; (5) "subjectivity"; and (6) that "a purported expert's opinion was prepared solely for litigation." *Id.* (first citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009); then citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007)).

¶ 58    Each of these red flags, to one degree or another, is present here.  For example, Inspector Gilliam's hypothesis regarding the relationship between the angle of impact and the shape of the bullet hole is based on anecdotal observations incidental to his training and experience as a sniper.  Further, his conclusion is subjective (i.e., the "similarity" of the shapes of various bullet holes) and is extrapolated from two data points, which were recorded during a test developed specifically for this litigation.  The prevalence of these red flags further supports our conclusion that it was an abuse of

27

discretion for the trial court to permit Inspector Gilliam to testify as an expert in the relationship between the shape of a bullet hole and the angle of the bullet's impact.

¶ 59     Finally, even if the prosecutor had introduced only the results of the windshield experiment through lay testimony, without any lay or expert opinions, those results would still be inadmissible. *Cf. People v. Wilkerson*, 114 P.3d 874, 876-77 (Colo. 2005) ("Even though a general area of scientific knowledge is determined to be reliable, if the results of a scientific test or comparison are not self-evident, the test itself lacks relevance unless there is also reliable expert interpretation of its results."). Under CRE 403, if the probative value of any evidence is substantially outweighed by the dangers of unfair prejudice and misleading the jury, the evidence must be excluded. This evidence, on this record, is unfairly prejudicial and misleading because it supports the prosecutor's theory of the case, even though there is nothing in the record to show that anything but randomness accounted for any similarity between the actual bullet hole and the hole created by the shoulder-height test shot.

## IV.  The Error Was Not Harmless

¶ 60    Unless it implicates the defendant's constitutional rights, an error in the admission of expert testimony requires reversal only when it "substantially influence[d] the verdict" or "affect[ed] the fairness of the trial proceedings." *Ruibal*, ¶ 17.

¶ 61    Ornelas-Licano urges that the error implicated his constitutional rights and, therefore, we must apply the constitutional harmless error standard.  We do not reach the question of whether the constitutional harmless error standard applies because we conclude that the error is reversible under the more stringent nonconstitutional harmless error standard.

¶ 62    Attempted second degree murder is a serious crime, and Ornelas-Licano faced a lengthy prison sentence if convicted.  To obtain a conviction, the prosecutor had to prove beyond a reasonable doubt that Ornelas-Licano knowingly engaged in conduct that was a substantial step toward causing the death of the officer in the vehicle at the intersection.  To make this case, the prosecutor introduced two main types of evidence.  First, the prosecutor elicited expert testimony and introduced exhibits related to the windshield experiment to show that Ornelas-Licano fired the

gun from a "natural shooting position."  Second, the prosecutor elicited testimony from a jailhouse witness who claimed that, before the incident, Ornelas-Licano had told him that he intended to have a "shootout" with police rather than be taken into custody.

¶ 63 Disregarding the testimony of Inspector Gilliam regarding the shape of the bullet hole and evidence of the windshield test, the strongest support for the prosecutor's theory that Ornelas-Licano pointed the gun at the officer's vehicle and fired was the testimony of the jailhouse witness.  But direct and cross-examination of the jailhouse witness undermined his credibility in several ways.  At the time of trial, the jailhouse witness was in custody and subject to deportation proceedings.  He testified that he had been paid as a police informant eleven times before this case, he was facing a charge for false reporting to police, and his deportation hearing would be held the day after his testimony in this case.

¶ 64 Moreover, "[t]here are special concerns attendant to law enforcement expert testimony." *United States v. Rodriguez,* 125 F. Supp. 3d 1216, 1238 (D.N.M. 2015) (citing *United States v. Medina–Copete,* 757 F.3d 1092 (10th Cir. 2014)).  For example, "there is something qualitatively different about law enforcement expertise

from other forms of expertise" because "[l]aw enforcement officers . . . are experts in whodunit, and there is a danger that a jury will perceive their area of expertise as solving crimes and determining guilt or innocence." *Id.* at 1252; *see also Frazier*, 387 F.3d at 1263 ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").

¶ 65 In short, given that there was nothing showing that Inspector Gilliam's testimony or the windshield experiment was reliable, the importance of the testimony to a central disputed issue, and the weakness of the other evidence supporting the prosecutor's theory of the case, the admission of Inspector Gilliam's expert testimony and the windshield evidence substantially affected the verdict and undermined the fairness of the trial. Accordingly, reversal is required.

¶ 66 Because we reverse on these grounds, we do not address Ornelas-Licano's other arguments related to Inspector Gilliam's testimony and windshield experiment evidence.

31

## V. Conclusion

¶ 67     Ornelas-Licano's conviction for attempted second degree murder is reversed, and the case is remanded for a new trial on that charge.  Because the issue has not been briefed, we do not address the question of whether either party may seek a lesser included offense instruction as to the charge of attempted first degree assault – extreme indifference.  We do not disturb Ornelas-Licano's other convictions.

JUSTICE MARTINEZ concurs.

JUDGER BERGER concurs in part and dissents in part.

JUDGE BERGER, concurring in part and dissenting in part.

¶ 68    I agree with the majority's rejection of Jose Ornelas-Licano's equal protection claim.  Although a close question, I cannot agree with the majority's analysis and reversal based on the admission of expert testimony.  Therefore, I respectfully dissent.

I.    Admission of Expert Testimony Interpreting the Shape of the Bullet Hole in the Windshield and Evidence of the Windshield Experiment Was Not an Abuse of Discretion

¶ 69    Ornelas-Licano contends that the trial court abused its discretion by admitting testimony from the prosecution expert that, based on his experience and the windshield experiment, the elliptical shape of the bullet hole in the truck's windshield was more consistent with a shot fired from shoulder height than with a shot fired from the level of the stick shift.

¶ 70    Ornelas-Licano lodges multiple separate, but related, challenges.  First, he claims that the expert was not qualified.  Second, he claims that the opinions were not reliable under CRE 702.  Third, he claims that the evidence was "misleading" and not helpful to the jury because there were an infinite number of possible shooting positions.  Finally, he claims that the trial court's findings were insufficient under CRE 702.  I reject each of these

contentions in turn and conclude that the trial court did not abuse its discretion by admitting this expert testimony.

## A. The Expert's Qualifications and the Reliability of His Opinions

¶ 71 "The trial court has broad discretion to determine the admissibility of expert testimony." *Golob v. People*, 180 P.3d 1006, 1011 (Colo. 2008). "We will not overturn its decision unless it is 'manifestly erroneous.'" *Id.* (quoting *People v. Ramirez*, 155 P.3d 371, 380 (Colo. 2007)). "This deference reflects the superior opportunity of the trial judge to gauge the competence of the expert and the extent to which his opinion would be helpful to the jury." *Id.* (quoting *Ramirez*, 155 P.3d at 380).

¶ 72 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." CRE 702. To determine whether expert testimony is admissible under CRE 702, the court must make determinations as to (1) the "reliability of the scientific principles"; (2) the "qualifications of the witness"; and (3) the "usefulness of the testimony to the jury." *People v. Shreck*, 22 P.3d 68, 70 (Colo.

2001). "The 'crucial question' trial courts must answer when determining the admissibility of proffered expert testimony is: 'On *this subject* can a jury from *this person* receive appreciable help?'" *People v. Williams*, 790 P.2d 796, 798 (Colo. 1990) (quoting 3 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* § 702[01], at 702-7 to 702-8 (1988)).

¶ 73 Ornelas-Licano first contends that the expert was not qualified to testify, based on the shape of the bullet hole, what angle the shot came from. He further contends that any such testimony was unreliable. Because these contentions are related, I address them together.

¶ 74 Ornelas-Licano correctly points out that the expert had no training or education in analyzing bullet holes to determine a bullet's flight path or reconstructing shooting scenes generally. In addition, he correctly states that the expert presented no scientific literature or other evidence supporting the reliability of his bullet hole analysis.

¶ 75 CRE 702, however, allows an expert to testify based on his or her experience. The inquiry under CRE 702 "should be broad in nature and consider the totality of the circumstances of each

35

specific case." *Shreck*, 22 P.3d at 70. There is no exclusive list of factors that a court must consider. *Id.*

¶ 76 As foundation for his opinions, the expert testified that he had extensive experience in shooting through vehicle windshields in connection with his training as a police sniper. I recognize that the primary purpose of those shootings was to determine the effect of an intervening windshield on a bullet's trajectory after it passed through the glass. But the expert also testified that he had repeatedly observed a relationship between the angle of impact of a bullet on the windshield and the shape of the hole made by the bullet.

¶ 77 In response to the question, "In your training and experience, what does an elliptical hole indicate?" the officer testified that "in firearms or bloodstain, it indicates that it's been deposited at an angle." Similarly, in a report that was not offered or presented to the jury, but was received and considered by the court during the *Shreck* hearing, the officer stated that "[f]rom previous experience and testing of shots through a windshield, an elliptical hole indicate[s] that the bullet has struck the windshield at an angle other than perpendicular."

¶ 78    On these facts, I believe that the trial court acted within its discretion in concluding that the officer was qualified to testify regarding his conclusions based on the shape of the bullet hole in the windshield.  A person who has shot through a hundred windshields and has observed the relationship between the angle of impact and the shape of the bullet holes meets the qualifications requirements of CRE 702.

¶ 79    The closer and more difficult question is whether the foundational testimony was sufficient to meet the reliability requirement of CRE 702.  I emphasize that the question before us is not whether we appellate judges would have admitted the testimony, had we acted as the trial judge.  *People v. Rhea*, 2014 COA 60, ¶ 58.  Instead, the question is whether the trial court abused its discretion by admitting the expert testimony on this evidentiary record.  *Id.*

¶ 80    I conclude, after applying this deferential abuse of discretion standard, that the trial court did not abuse its discretion in finding that the expert testimony was sufficiently reliable under CRE 702.  Contrary to the majority's analysis, cases where the Colorado

Supreme Court has held experience-based expert testimony inadmissible do not dictate a different result.

¶ 81     In *Ruibal v. People,* the supreme court held that it was error for the trial court to admit expert testimony from a forensic pathologist because (1) the trial court did not make any findings concerning the reliability of the principles underlying the expert's theory and (2) the record was devoid of support as to the theory's reliability.  2018 CO 93, ¶ 15.  The expert in that case had experience in conducting autopsies and had on many occasions learned, at trial, about an assailant's relationship to his or her victim.  *Id.*  He testified that the victim's injuries in *Ruibal* demonstrated "overkill," a term describing multiple injuries on one area of the body, which indicates that the assailant had an emotional attachment to the victim.  *Id.* at ¶ 9.

¶ 82     Both justifications for excluding the expert opinion in *Ruibal* are absent from this case.  The trial court found that the expert's theory was sufficiently reliable.  In an oral ruling, the court stated, "The defense has argued that the scientific principles involved here are unreliable.  I don't agree."  The record supported this finding.  The expert testified that he had shot through over one hundred

windshields, and that his experiences identified a relationship between the angle of impact of a bullet on the windshield and the shape of the hole left by the bullet.

¶ 83    The results of the expert's experiment buttressed his experienced-based observations such that the trial court could properly find his bullet-hole theory reliable. For the experiment, the expert obtained two new windshields that were the same type as the one in Ornelas-Licano's truck. He fired Ornelas-Licano's gun through one of the windshields at approximately the same angle as a shot fired from the level of the truck's stick shift. He then fired the gun through the second windshield at approximately the same angle as a shoulder-height shot. Photographs of the two test firings demonstrated that the shot made from the gear shift caused a circular bullet hole, while the test shot made from shoulder height caused a more elliptical hole. This kind of data was absent from the record in *Ruibal,* where the expert gave no "anecdotal, much less empirical, evidence supporting his conclusion." *Id.* at ¶ 15.

¶ 84    *Salcedo v. People*, 999 P.2d 833 (Colo. 2000), is similarly distinguishable. In that case, the supreme court held that testimony that a defendant matches a "drug courier profile" is not

39

an admissible expert opinion. *Id.* at 837. There, a police detective was qualified as an expert in "narcotics interviews," and, based on a "loose profile" of behaviors and characteristics that the detective had constructed based on prior experience with drug couriers, the detective testified that he believed that Salcedo was a drug courier. *Id.* at 835 –36.

¶ 85 The supreme court held that this testimony was inadmissible on reliability grounds because "application of the drug courier profile *depends substantially on a subjective, if not intuitive, judgment* that a person's behavior and characteristics warrant further investigation," and because "[the expert] based his opinion of Salcedo's guilt on a subjective assessment of the 'totality of the circumstances' rather than on an articulable combination of behaviors and characteristics in an objective drug courier profile." *Id.* at 838 –39 (emphasis added).

¶ 86 Although both the expert in *Salcedo* and the expert in this case developed their theories based on prior experience, those experiences were different in kind. The expert's theory in this case was not based on his subjective gut feelings, but rather on his objective, definable, and simple observations: there is a relationship

between a bullet's angle of impact and the shape of hole it leaves in glass. Instead of analyzing many factors and variables under "the totality of the circumstances," *id.* at 839, the expert here identified a more limited number of variables pertinent to his theory and then explained a precise result — namely, that when a bullet strikes glass at a nonperpendicular angle, there will be an elliptical hole. This is in stark contrast to the inadmissible expert opinion in *Salcedo*, which was tantamount to "I think defendant was a drug courier because I've seen drug couriers before, and he looked like one." In sum, while the expert's opinion in *Salcedo* was indeterminate and subjective, *id.*, the detective's opinion here was determinate and objective.

¶ 87 The officer testified as an expert about his theory of the case based on his experience, which was validated by the (albeit limited) results of his experiment with the windshields. While no scientific evidence was presented regarding the physics of why or how the angle of impact related to the shape of the bullet hole, as I read the supreme court's opinion in *Shreck*, such scientific evidence (which may entail peer review and other confirmations of reliability) is not always required. *Shreck*, 22 P.3d at 77-78.

41

¶ 88    Our function is limited to determining whether a sufficient showing of reliability was made.  It is the jury's function to determine, based on cross-examination, the presentation of rebutting expert evidence, and all other relevant factors, whether to credit that testimony.  COLJI-Crim. E:06 (2019); *Hampton v. People*, 171 Colo. 153, 165, 465 P.2d 394, 400 (1970).

¶ 89    I note that the defense expert, who indisputably was qualified as a ballistics expert, did not dispute the central assumption of the prosecution expert — that the angle of impact bears a causal relationship with the shape of the bullet hole.  Instead, the defense expert contended that the prosecution expert's testimony was wrong (or unreliable) because there were "too many unknowns and too many variables in this particular case."  He testified that it was impossible, based on the shape of the bullet hole and the windshield experiment, to reach any specific conclusions about the location of the gun when the shot was fired.

¶ 90    I am mindful that it is unfair to hold a defendant's diligence in calling a defense expert against the defendant, and I agree that the testimony of the later-called defense expert should not bear on the question of the admissibility under CRE 702 of the prosecution

42

expert's opinions.[8]  Nevertheless, following a number of cases

decided by this court, the fact that a defense expert addressed and

disagreed with the prosecution expert's opinions is properly

considered for two purposes.  *See People v. Shanks*, 2019 COA 160,

¶ 41; *Schuessler v. Wolter*, 2012 COA 86, ¶ 73; *People v. Masters*, 33

P.3d 1191, 1202 (Colo. App. 2001), *aff'd*, 58 P.3d 979 (Colo. 2002).

¶ 91    First, particularly when, as here, the defense expert does not

contest the central premise or causal analysis of the prosecution

expert, the risk that the prosecution expert's opinions were "junk

science," and that the defendant was convicted on the basis of such

junk science, is substantially ameliorated.  Second, when the

defense presents a rebutting expert, the jury has more tools to

evaluate whether, in the end, the prosecution expert's opinions are

worthy of belief.  (Of course, we have no way of knowing whether

the prosecution expert's opinions had any bearing on the jury's

verdict.)

---

[8] The defense expert did not testify at the *Shreck* hearing conducted
regarding the admissibility of the prosecution expert's testimony;
and therefore his testimony did not bear on the trial court's
determination that the prosecution expert's testimony was
admissible under CRE 702.

¶ 92    For these reasons, I conclude that the trial court did not abuse its discretion by admitting this testimony.

### B.    The Expert's Opinions, Based on Two Potential Shooting Positions, Were Helpful to the Jury and Were Not Misleading

¶ 93    Ornelas-Licano next argues that the expert's testimony was misleading and not helpful to the jury because it only addressed two possible shooting positions, and there were many other possibilities.  The central issue in this case is whether Ornelas-Licano accidentally shot through the windshield or did so deliberately in an attempt to kill the officer.

¶ 94    Testimony by a qualified expert giving reliable opinions regarding the relationship between the angle of impact and the shape of resulting bullet holes through a windshield could help the jury decide whether to credit Ornelas-Licano's account of the incident or the prosecutor's theory.  Therefore, based on my determination that the expert was qualified and that his opinions were sufficiently reliable to be presented to the jury, I reject Ornelas-Licano's argument that the expert's opinions could not have been helpful to the jury.

44

¶ 95    Additionally, the expert's testimony did not preclude the jury's consideration of other possible shooting positions. Indeed, defense counsel emphasized these other possibilities in opening and closing. Therefore, the testimony was not misleading.

    C.    The Trial Court's Findings Under CRE 702 Were Sufficient

¶ 96    Finally, Ornelas-Licano argues that the trial court "failed to make sufficient findings to support its rejection of [his] reliability challenge." "[U]nder CRE 702, a trial court must issue specific findings as it applies the CRE 702 and 403 analyses." *Shreck*, 22 P.3d at 83. Contrary to Ornelas-Licano's argument, the trial court paused the trial to hold a *Shreck* hearing and concluded that the proposed expert testimony was reliable. Moreover, as both the majority's and my analysis of the admissibility of the expert opinions demonstrates, the trial court's findings were sufficient for us to perform our appellate function. *Tatum v. Basin Res., Inc.*, 141 P.3d 863, 869 (Colo. App. 2005).

¶ 97    For these reasons, I would hold that the trial court did not abuse its discretion by admitting the prosecution expert's opinions analyzing the shape of the bullet hole in the windshield.

D.    The Results of the Windshield Experiment Were Properly Admitted

¶ 98    Ornelas-Licano separately challenges the expert's qualifications to conduct the windshield experiment and the admission of the results of the experiment.[9]

¶ 99    As Ornelas-Licano correctly points out, the expert had no training or education related to conducting this specific kind of experiment. He had never done this before, and he cited no scientific literature or other support for this methodology.

¶ 100    However, the expert had participated in sniper trainings involving shooting through glass at various angles and analyzing the bullets' trajectories. Further, he explained in detail the methodology behind the experiment, including why certain angles were chosen and how those angles were recreated. I conclude that

---

[9] It is not clear that that windshield experiment or its results are expert testimony subject to CRE 702. *Compare People v. Caldwell*, 43 P.3d 663, 667-68 (Colo. App. 2001) (police officer determined paths of bullets through a car using a string and properly testified as a lay witness about the bullets' trajectories), *with People v. Stewart*, 55 P.3d 107, 123-25 (Colo. 2002) (police officer's accident reconstruction testimony was improperly admitted as lay testimony). Neither party addresses this question. Because both parties analyze these contentions using CRE 702 principles, I do the same.

46

this foundation was sufficient for the admission of the results of the experiment.

¶ 101　Ornelas-Licano also argues that the experiment did not account for other variables in play during the shooting.  But as I discussed above, "challenges to . . . the expert's application of variables [go] to the weight of the evidence, not its admissibility." *Shanks*, ¶ 40.  "Such concerns 'are adequately addressed by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"  *Id.* at ¶ 12 (quoting *People v. Campbell*, 2018 COA 5, ¶ 42).

¶ 102　Ornelas-Licano next contends that videos documenting the windshield experiment were unduly prejudicial because in those videos the gun was fired toward the viewer.  I disagree.  While the video camera was in front of the windshield, the gun itself was not visible because it was being fired at an angle to the windshield (as if from the driver's side).  Each video simply shows a bullet hole appearing in the windshield and does not "suggest a decision on an improper basis."  *People v. Clark*, 2015 COA 44, ¶ 18 (quoting *People v. James*, 117 P.3d 91, 93-94 (Colo. App. 2004)).  Thus, this

testimony was not "unduly prejudicial" under CRE 403. *People v. Palacios*, 2018 COA 6M, ¶ 20.

¶ 103   Further, for the reasons stated in the previous section, the experiment results and resulting testimony could have been helpful to the jury and were not misleading.

¶ 104   On these facts, the trial court did not abuse its discretion by admitting the windshield experiment results and the expert testimony relating to the experiment.

## II.   Conclusion

¶ 105   For these reasons, I would affirm the judgment of conviction.