23CA1021 Peo v Ravenell 04-17-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1021
El Paso County District Court No. 22CR629
Honorable Jill M. Brady, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Demar Rayel Ravenell,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE SCHOCK
Freyre and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 17, 2025

Philip J. Weiser, Attorney General, Cata A. Cuneo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Mallika L. Magner, Alternate Defense Counsel, Crested Butte, Colorado, for Defendant-Appellant

¶ 1     Defendant, Demar Rayel Ravenell, appeals his convictions for first degree murder, attempted first degree murder, and aggravated robbery.  He argues that the district court erred by admitting (1) his grandmother's audio-recorded statements referring to his out-of-state warrant; (2) a detective's testimony that the individual seen in various video clips was the same person; and (3) a photograph of Ravenell holding up his middle fingers.  We affirm the judgment.

## I.     Background

¶ 2     On an early January morning, a taxi picked up a passenger from the parking lot of the Ranch Motel.  Fifteen minutes later, the passenger shot and killed the driver.  The victim's body was found the next morning, without the fanny pack he normally carried.

¶ 3     The murder and the fifteen-minute ride that preceded it were captured on video from a camera inside the taxi.  It showed the passenger wearing a hoodie, camouflage pants, and slide sandals with white socks.  The passenger's face was partially obscured by the hood and neck of the hoodie.  At one point during the ride, the passenger pointed a gun at the driver's head, but although the gun clicked, it did not fire.  The driver, unaware, continued driving.

¶ 4    A few minutes later, the passenger directed the driver to stop, held the gun to the driver's head, and told him to "give me everything that you've got, now."  After the driver gave him what money he had, the passenger shot the driver in the head and fled.

¶ 5    To identify the shooter, officers viewed surveillance video from the Ranch Motel and another motel across the street, the Best Inn Motel, which was managed by Ravenell's grandmother.  The video footage showed Ravenell's grandmother letting Ravenell into the Best Inn Motel office a little after 1 a.m.  Ravenell was wearing camouflage pants, a camouflage hoodie with the hood pulled up, and slides with socks.  There was also a rectangular object sticking out of his right pants pocket that a detective later testified appeared to be an extended magazine for a handgun.  Ravenell left the motel lobby about twenty minutes later and walked toward the rooms.

¶ 6    An hour later, a man walked by the camera again in the opposite direction.  He was wearing the same clothing, except that a plain-colored hoodie, still with the hood pulled up, had replaced the camouflage one.  The rectangular object was still visible in his pocket.  About thirty minutes later, the man entered the taxi.

¶ 7    There was also surveillance video after the murder from nearby businesses.  That video showed the shooter walking away from the taxi toward a distribution warehouse for the Gazette newspaper, where Ravenell's girlfriend worked the night shift.

¶ 8    Minutes later, Ravenell appeared in the Gazette parking lot, where he walked to his girlfriend's parked car and tried to open the door, holding an object that appeared to be a fanny pack.  Ravenell saw the warehouse manager and asked him to get his girlfriend's keys from her, which he did.  Ravenell then got into the passenger seat of the car and waited until his girlfriend's shift ended, at which point they drove off together.  Officers later found slides with the victim's blood on them and the victim's fanny pack in the car.

¶ 9    Ravenell was charged with the murder and related offenses. The charges included first degree murder, attempted first degree murder (for the first time he pointed the gun at the victim), second degree murder, aggravated robbery, and two crime of violence sentence enhancers.  He was convicted by a jury on all counts and sentenced to consecutive sentences of life without parole for the first degree murder and forty-eight years for the attempted murder, with a concurrent thirty-year sentence for the aggravated robbery.

## II. Reference to Warrant

¶ 10    Ravenell contends that the district court reversibly erred by admitting portions of an audio recording of his grandmother's interview with police in which she alludes to his outstanding warrant in South Carolina. We perceive no basis for reversal.

### A. Additional Background

¶ 11    The first time police interviewed Ravenell's grandmother, she said the person in the video footage was her son, Leroy Ravenell.[1] The investigation therefore initially centered on Leroy. But the investigation turned toward Ravenell after police learned he had an outstanding warrant for homicide in South Carolina. Based on that new information, the detective re-interviewed the grandmother and asked her if Ravenell had been at the motel the night of the murder.

#### 1. Grandmother's Statements

¶ 12    The grandmother initially maintained that the person in the video was either Leroy or a man named Charlie. She acknowledged that Ravenell was "wanted" in South Carolina and said that if he

---

[1] Because Leroy Ravenell shares the same last name as the defendant, we refer to him by his first name, intending no disrespect. We refer to the defendant by his last name.

4

had shown up, she would have told him to turn himself in. She also said that the owners of the motel told her to call the police if Ravenell contacted her or came to the motel. She claimed that the first she knew Ravenell was in Colorado was when he called her from jail after his arrest in this case. Both she and the detective made various other references to the "trouble" Ravenell was in.

¶ 13    Eventually, the grandmother admitted that it was Ravenell who had been at the motel the night of the murder and that she had told him he needed to turn himself in. She explained that she told him he could not stay at the motel because she did not want to get in trouble for hiding him. She also said it was a relief when Ravenell was caught because she was "nervous and scared."

## 2.    Pretrial Motion to Exclude

¶ 14    Ravenell moved before trial to exclude evidence of the South Carolina warrant as irrelevant, prejudicial, and improper other act evidence under CRE 404(b). The motion focused on statements Ravenell made about the warrant after his arrest. It also said the warrant was "mentioned by other witnesses who spoke with police."

¶ 15    The prosecution agreed not to mention what the warrant was for. But it argued that the existence of the warrant was intrinsic to

5

the charged crime — or if extrinsic, probative of identity — because it was the "determining factor that cause[d] [the grandmother] to finally tell the truth" about who was on the surveillance video. It also argued that the warrant explained why the grandmother had initially lied — to protect Ravenell from arrest on that warrant.

¶ 16 The district court held a pretrial hearing on the motion. At that hearing, the parties addressed the relevance of the warrant in connection with the grandmother's anticipated testimony. The prosecutor argued the warrant was relevant to show (1) why the grandmother had initially identified her son, Leroy, as the man in the surveillance video; and (2) why law enforcement shifted its investigation to Ravenell after initially getting a warrant for Leroy. The prosecutor asserted that the grandmother said in her police interview that she did not initially identify Ravenell because she knew he had a warrant and "didn't want to give him up." Defense counsel argued that the existence of the warrant was not relevant to identity and that the prosecution could establish identity in a less prejudicial manner than suggesting Ravenell had a criminal past.

¶ 17 The district court ruled that evidence of the existence of the warrant — but not what the warrant was for — was admissible

under CRE 404(b).  Applying the four-part test in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990), the court concluded that (1) it related to the material fact of identity; (2) it was logically relevant because it explained why the investigation had switched course from one person to another; (3) the logical relevance was independent of any intermediate inference of bad character; and (4) although the warrant was "certainly prejudicial," the probative value was not substantially outweighed by the danger of unfair prejudice.  The court agreed to give a limiting instruction.

### 3.    Grandmother's Trial Testimony

¶ 18    Before Ravenell's grandmother testified at trial, defense counsel elicited through cross-examination of the sergeant who supervised the investigation that, about a week after the shooting, the team had begun preparing an arrest warrant for Leroy.

¶ 19    The grandmother testified that she had let Ravenell into the Best Inn Motel the morning of the murder.  She acknowledged that she initially told the detective that the person she let in that morning was Leroy but said she was "under mistake with dates." She further testified that a few weeks later, after she was shown a photo of Ravenell, she identified him as the person she let in.

7

¶ 20    At that point, the prosecutor requested a bench conference and told the court that he intended to ask the grandmother "if the reason she initially identified [Leroy] as opposed to [Ravenell] is because [Ravenell] had a warrant from out of state." Defense counsel objected to the question as leading. The prosecutor explained that the reason for the proposed leading question was to avoid the risk of the grandmother saying that the warrant was for homicide. The court prohibited the leading question because she might "have some other reason" for initially identifying Leroy.

¶ 21    The prosecutor then asked the grandmother why she initially identified Leroy, and she said she "didn't remember the dates." She also said she did not know police were looking for Ravenell because no one asked about him until the detective showed her his photo. When asked if she was afraid she would be in trouble, she said she was, but only because she had initially identified the wrong person. She denied having any concern about Ravenell showing up at the motel and refused to acknowledge making any statements to the detective about what actions she would have taken if he had.

¶ 22    The prosecutor again requested a bench conference and told the court that, during the grandmother's interview with the

detective, she said that "if [Ravenell] showed up I would've told him he needs to turn himself in because he was wanted out of South Carolina." Defense counsel agreed "[t]hat is an accurate statement of what is in . . . the recording." The prosecutor then explained that he planned to ask the grandmother "the direct question" to set up the use of the interview as impeachment. Defense counsel responded that "the impeachment is preserved and set up."

¶ 23     Based on that concession, the prosecutor said he intended to play recordings of the grandmother's interview during the testimony of the detective. The court asked defense counsel if he was "okay with that." Defense counsel reiterated, "I believe the impeachment's been set up, so . . . I don't have any grounds to prevent it."

4.     Admission of the Recording and Limiting Instructions

¶ 24     During the detective's direct testimony, the prosecution played the recording of the interview without objection. As described above, the grandmother made various references in the interview to Ravenell being "wanted" in South Carolina and needing to "turn himself in," although she did not refer to the warrant explicitly.

¶ 25     After the recordings were played, the court gave the jury the following limiting instruction:

> Members of the jury, you just heard evidence that is only to be considered by you for a limited purpose. Specifically, you heard that Mr. Demar Ravenell was the subject of an out-of-state warrant. You are instructed that you may only consider this evidence as it pertains to [the grandmother's] initial hesitation to identify Mr. Demar Ravenell while speaking with investigators and for no other purpose.

¶ 26 The court gave a slightly modified instruction after trial to avoid implying that the reason for the grandmother's initial hesitation to identify Ravenell was the out-of-state warrant, noting that "her testimony wasn't entirely consistent with that." The final instruction regarding the evidence of Ravenell's warrant read:

> The court admitted certain evidence for a limited purpose. The evidence that Demar Ravenell had an out of state warrant was admitted for the limited purpose of explaining why [the grandmother] may have initially hesitated to identify Demar Ravenell to investigators and for no other. You are again instructed that you cannot consider that evidence except for this limited purpose. The defendant is to be tried for the crime charged in this case, and no other.

### B. Standard of Review and Applicable Law

¶ 27 The district court has broad discretion to determine the admissibility of evidence based on its relevance, probative value, and prejudicial impact. *People v. Elmarr*, 2015 CO 53, ¶ 20. We

review a district court's evidentiary rulings, including on the admissibility of evidence under CRE 404(b), for an abuse of discretion. *People v. Owens*, 2024 CO 10, ¶ 105; *Bondsteel v. People*, 2019 CO 26, ¶ 45. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when the ruling is based on a misunderstanding of the law. *Owens*, ¶ 105.

¶ 28 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Irrelevant evidence is inadmissible. CRE 402. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. CRE 403. In reviewing whether evidence should have been excluded under CRE 403, we afford the evidence its maximum reasonable probative value and the minimum unfair prejudice that might reasonably be expected. *People v. Acosta*, 2014 COA 82, ¶ 58.

¶ 29 Evidence of other crimes or acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1). But such evidence is admissible for "almost any non-propensity

11

purpose." *Rojas v. People*, 2022 CO 8, ¶ 28; *see also* CRE 404(b)(2). Thus, evidence of extrinsic acts that are suggestive of bad character is admissible only if it is (1) logically relevant (2) to a material fact (3) independent of the prohibited inference of the defendant's bad character, and (4) its probative value is not substantially outweighed by the risk of unfair prejudice. *Rojas*, ¶¶ 27, 52.

### C. Preservation

¶ 30 We first question the parties' agreement that Ravenell's objection to his grandmother's references to the warrant in her police interview was adequately preserved in the district court — at least to the full extent he argues on appeal. *See People v. Carter*, 2021 COA 29, ¶ 13 (noting our "independent, affirmative obligation" to consider preservation, notwithstanding the parties' concessions).

¶ 31 Although Ravenell objected before trial to the admission of evidence of the warrant, he did not specifically tie that objection to the admission of the recorded interview — the only evidence he challenges on appeal. *People v. Ujaama*, 2012 COA 36, ¶ 37 (holding that objection must be specific enough to alert the district court to particular issue raised on appeal). The district court explained that the warrant would be relevant, for example, *if* it

12

came out at trial that the grandmother first identified Leroy and "only changed her mind after she was pressured by the police." The court then issued a somewhat tentative ruling, noting that it may modify its ruling depending how the evidence came in at trial.

¶ 32 Ravenell did not again object to evidence of the warrant (except a sustained objection to a proposed leading question). He did not object to the admission of the interview. Nor did he alert the district court that portions of that interview — a forty-minute recording that only indirectly alluded to the warrant a handful of times — implicated the out-of-state warrant issue. To the contrary, Ravenell expressly conceded the recording was admissible for impeachment purposes. *See People v. Hoggard*, 2017 COA 88, ¶ 11 (noting that the invited error doctrine applies when a party "expressly acquiesces to conduct by the court or the opposing party") (citation omitted), *aff'd on other grounds*, 2020 CO 54.

¶ 33 Thus, at most, Ravenell preserved a general objection to evidence of the warrant. Even assuming that objection extends to Ravenell's grandmother's tacit references to the warrant in her police interview, it does not encompass several other arguments Ravenell makes or insinuates on appeal, including that

- the conditions the district court placed on admissibility in its pretrial order were not satisfied, *see People v. Dinapoli*, 2015 COA 9, ¶ 19 (requiring party to contemporaneously object to violation of pretrial order to preserve issue for appeal);

- the prosecutor was incorrect when he told the court at the pretrial hearing that the grandmother said the reason she did not initially identify Ravenell was his outstanding warrant;

- the prosecutor's questions to the grandmother about her reasons for initially identifying Leroy were improper; and

- other statements made by the grandmother in her interview — including that she was worried, nervous, and scared — created a risk of unfair prejudice.

¶ 34 We review unpreserved evidentiary claims for plain error, meaning we will reverse only if the error was "obvious, substantial, and 'so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.'" *People v. Snelling*, 2022 COA 116M, ¶ 33 (citation omitted).

¶ 35 Because Ravenell does not develop any independent plain error argument with respect to any of these ancillary issues, apart from his primary challenge to his grandmother's references to the

warrant, we do not separately address them. *See People v. Perez*, 2024 COA 94, ¶ 52 (declining to address undeveloped arguments).

### D. Relevance

¶ 36    We agree with the district court that the existence of the warrant — and Ravenell's grandmother's knowledge of that warrant — was relevant for two purposes: identity and impeachment.

¶ 37    First, the warrant served to answer two logical questions related to the identity of the shooter: Why did Ravenell's grandmother initially identify her son, Leroy, as the person in the surveillance video before later identifying Ravenell? And why did the focus of the investigation shift from Leroy to Ravenell? *See Elmarr*, ¶ 28 ("In a criminal prosecution, identity is a material element of any charged crime."). It answered the first by offering a reasonable explanation as to why the grandmother might have been reluctant to admit Ravenell had been at the motel — i.e., she was worried about getting Ravenell arrested, herself in trouble, or both. And her later change in identification offered a basis for the change in the target of the investigation. Thus, the existence of the warrant made it more probable that the grandmother's belated identification of Ravenell was correct and, thus, that Ravenell was the shooter.

15

¶ 38    Second, the grandmother's statements in the interview were relevant for impeachment.  At trial, the grandmother testified that the only reason she had initially misidentified Ravenell as Leroy was that she had confused the dates.  She said she had no concern about Ravenell showing up at the motel and, although she acknowledged asking the detective if she was going to be in trouble, she said the only reason for her concern was that she had made an incorrect identification.  The grandmother's statements in the interview — that she told Ravenell he could not stay at the motel, that the motel owners told her to contact police if he showed up, and that she did not want his "situation" to get her in trouble — were inconsistent with her trial testimony.  CRE 613.  And to the extent the prosecutor did not refer her to the exact language of her prior statements, Ravenell's counsel invited any error by agreeing that the impeachment was properly "set up."  *See Hoggard*, ¶ 11.

¶ 39    Ravenell argues that his grandmother's statements about the warrant were not relevant because she never explicitly attributed her original misidentification to the warrant.  But whether the grandmother admitted that was the reason or not, it was a fair inference for the prosecution to attempt to draw from the evidence

— particularly when the grandmother did not offer any other reason for confusing her son with her grandson. It was for the jury to decide whether the evidence supported that inference. Moreover, regardless of whether the warrant played a part in the grandmother's initial reluctance to identify Ravenell, the grandmother made several *other* statements about the warrant during the interview that were inconsistent with her trial testimony.

¶ 40 We also disagree with Ravenell's contention that the prosecution had no reason to address his grandmother's initial identification of Leroy at all. In Ravenell's opening statement, his counsel identified Leroy as another potential suspect whom law enforcement had identified and investigated. Then, during cross-examination of the lead sergeant on the investigation, defense counsel elicited that Leroy had been a potential suspect, so much so that investigators had begun preparing a warrant for his arrest. It was also reasonable to presume that defense counsel would bring up the grandmother's initial identification of Leroy if the prosecutor did not. The prosecution was entitled to front that issue by acknowledging the initial identification and attempting to show why the focus of the investigation shifted from Leroy to Ravenell.

## E. CRE 404(b)

¶ 41 We also agree with the district court that the admission of the grandmother's references to the warrant did not violate CRE 404(b).

¶ 42 First, CRE 404(b) applies only to evidence of an "other crime, wrong, or act." CRE 404(b)(1); *see also People v. Hall*, 60 P.3d 728, 736 (Colo. App. 2002). The existence of a warrant is not itself an "other crime, wrong, or act." At most, it is evidence from which another crime could be inferred. But the district court properly excluded any evidence of that underlying crime. Thus, it is not clear that Rule 404(b) applies. *Cf. Hall*, 60 P.3d at 736 (holding that CRE 404(b) did not apply to evidence of the defendant's multiple personality disorder because it did not relate to any actions).

¶ 43 But even assuming the warrant constitutes evidence of another crime or act, it satisfies the four-part test for admissibility. Its logical relevance to the material fact of identity — as discussed above — is wholly independent of any inference of Ravenell's character. Indeed, its relevance is independent of Ravenell's prior *acts.* In short, the existence of the warrant made it more likely that Ravenell was the shooter not because he had committed other crimes or had the propensity to do so, but because it explained why

18

his grandmother might have initially identified a different person. *See People v. Lancaster*, 2022 COA 82, ¶ 47 ("[T]he crucial question is whether a jury could reasonably consider [the] evidence for a proper purpose, independent of [a] bad character inference.").[2]

### F.    CRE 403

¶ 44    We next conclude that the district court did not abuse its broad discretion under CRE 403 in balancing the probative value of the references to Ravenell's warrant against the danger of unfair prejudice. *See People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995).

¶ 45    For the reasons discussed above, Ravenell's grandmother's references to the warrant provided a rational explanation for what was otherwise a confusing quandary: Why would she have falsely implicated her own son in a crime?  The probative value of that explanation increased when, during her direct testimony, the grandmother offered no real answer to this question other than confusion as to dates and denied that she had any concern about Ravenell being at the motel.  The warrant helped fill these gaps.

---

[2] Because the fourth prong of the test for admissibility under CRE 404(b) is the application of the CRE 403 balancing test, *see Rojas v. People*, 2022 CO 8, ¶ 27, we address that prong in the next section.

¶ 46     On the other hand, as the district court recognized, evidence that Ravenell had a warrant in another jurisdiction presented a risk of unfair prejudice. But that risk was substantially mitigated by the district court's repeated admonition — with which all parties complied — that there be no mention of what the warrant was for. *See Kerr v. Commonwealth*, 400 S.W.3d 250, 263-64 (Ky. 2013) (holding that evidence of unrelated warrant was not unduly prejudicial where court excluded evidence of underlying offenses on which warrants were based). In the context of a murder case, the existence of a warrant for an unidentified other crime — of unknown severity — was not itself so prejudicial as to make the district court's decision to admit it an abuse of discretion.[3] Moreover, the risk of unfair prejudice was further mitigated by the limiting instruction directing the jury to consider the warrant only

---

[3] Ravenell points to his grandmother's statements in her interview that she was nervous, scared, and worried as an indication that the warrant was for something serious. But as noted above, Ravenell did not object to these statements — which did not directly address the warrant — in the district court, and their admission as part of the recorded interview was not so obviously improper as to constitute plain error. *See Nicholls v. People*, 2017 CO 71, ¶ 61 (holding that "brief, isolated statements" did not constitute plain error under CRE 403 where prosecution did not rely on testimony and defendant's conviction was amply supported by other evidence).

in assessing the grandmother's initial hesitation to identify Ravenell. *See Lancaster*, ¶ 50 (noting relevance of the "potential effectiveness of a limiting instruction" to a CRE 403 analysis).

¶ 47 Thus, giving the evidence its maximum reasonable probative value and its minimum reasonable prejudicial effect, as we must, *see Acosta*, ¶ 58, the district court did not abuse its discretion in concluding that the latter did not substantially outweigh the former.

## G. Harmlessness

¶ 48 Finally, even if we were to conclude the district court abused its discretion by admitting the grandmother's statements alluding to Ravenell's warrant, we would conclude that any error was harmless.

¶ 49 We review preserved evidentiary errors for harmless error. *People v. Hines*, 2021 COA 45, ¶ 40. Although Ravenell invokes the constitutional harmless error standard of "harmless beyond a reasonable doubt," *Hagos v. People*, 2012 CO 63, ¶ 11, the "[e]rroneous admission of CRE 404(b) evidence is not error of constitutional dimension," *Yusem v. People*, 210 P.3d 458, 469 n.16 (Colo. 2009). And Ravenell has not otherwise "demonstrated that any evidentiary error rose to the level of constitutional error." *People v. Dominguez-Castor*, 2020 COA 1, ¶ 70. Thus, we apply the

nonconstitutional harmless error standard. *See Yusem*, 210 P.3d at 469. Under this standard, we will not reverse unless there is a reasonable probability the error contributed to the conviction. *Id.*

¶ 50 Viewed in context of the record as a whole, we discern no reasonable probability that the grandmother's references to the warrant contributed to Ravenell's convictions. Those statements comprised a few minutes of a forty-minute recording that was played once during a seven-day trial. *See People v. Daley*, 2021 COA 85, ¶ 98 (holding that improper testimony was harmless where it covered a page and a half of transcript during an eight-day trial). Outside of that recording, the warrant was never mentioned again. And the jury never learned what the warrant was for. It is hard to imagine a jury convicting Ravenell of the brutal murder in this case because he had an unspecified warrant in another state.

¶ 51 On the other side of the equation, the evidence tying Ravenell to the shooting was substantial. *See Ruibal v. People*, 2018 CO 93, ¶ 17 (noting that "[t]he strength of properly admitted evidence supporting the verdict is one important consideration" in evaluating whether an error is harmless). Ravenell's grandmother testified that Ravenell had been at the Best Inn Motel the morning of the

murder and identified him as the person in the surveillance video; Ravenell's clothing in that video generally matched the clothing of the person who was seen on other video that night and picked up by the taxi across the street two hours later; Ravenell was seen getting into his girlfriend's car at the Gazette warehouse near the shooting shortly after it occurred, as the girlfriend later confirmed; and the victim's blood and fanny pack were later found in that car.

¶ 52 Given the limited scope of the statements in question in the context of the entire trial, and the strength of the other evidence, the grandmother's allusions to the warrant in her police interview — even if erroneously admitted — "did not substantially influence the verdict or affect the fairness of the trial proceedings." *Id.*

### III. Lay Opinion Testimony

¶ 53 Ravenell next contends that the district court reversibly erred by allowing a police sergeant to provide improper lay opinion testimony that the individual in various surveillance videos was the same person. We disagree because any error was not plain.

### A. Additional Background

¶ 54 The prosecution's case was based in large part on piecing together surveillance videos from the Ranch Motel and Best Inn

23

Motel in the hours before the murder. Those videos showed, in separate clips, (1) an individual, identified as Ravenell by his grandmother, entering and leaving the Best Inn Motel office; (2) an individual later walking around the Best Inn Motel; and (3) the eventual shooter getting in the taxi outside the Ranch Motel. The prosecution's theory was that it was Ravenell in each of those clips.

¶ 55    The detective who collected and reviewed the surveillance videos, Marcus Lehmkuhl, testified at trial. He explained that he had viewed six to eight hours of video from multiple cameras, working backward from the taxi pickup to determine where the individual who got in the taxi had come from. As the surveillance footage was played for the jury, Lehmkuhl described what was happening in the videos, providing context regarding the surrounding locations and the positions of the various cameras.

¶ 56    In doing so, Lehmkuhl testified multiple times that the individual in one video clip was the same person — or appeared to be the same person — as the individual in another clip. He based that opinion primarily on the individual's clothing, including his jacket, pants, and slides. At one point, Lehmkuhl noted that the individual was wearing a different jacket. But he still believed it to

be the same individual based on his other clothing, an object sticking out of his pants pocket, and his general appearance.

### B. Applicable Law and Standard of Review

¶ 57 Lay opinion testimony — i.e., the opinion of a non-expert witness — is admissible if it is (1) rationally based on the perception of the witness; (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge within the scope of CRE 702. CRE 701. Such testimony "describ[es] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a firsthand witness to a particular event." *People v. McFee*, 2016 COA 97, ¶ 76 (citation omitted).

¶ 58 A witness may testify about "the identity of a person depicted in a surveillance video 'if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the [video] than is the jury.'" *People v. Grant*, 2021 COA 53, ¶ 64 (citation omitted). But a witness "may not form conclusions for jurors that they are competent to reach on their own." *McFee*, ¶ 76.

Thus, lay opinion testimony is not helpful to the jury when it is "based on exactly the same information" the jury has. *Id.*

¶ 59 We review the admission of lay opinion testimony for an abuse of discretion. *People v. Vergari*, 2022 COA 95, ¶ 16. But because Ravenell did not object to the testimony as improper lay opinion, we will reverse only for plain error. *See McFee*, ¶ 70. As noted above, that means the error must be "obvious and substantial, and . . . so undermine[] the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at ¶ 71.

## C. Analysis

¶ 60 Ravenell does not challenge Lehmkuhl's testimony about the surveillance videos generally, including the location of the cameras, the surrounding area, and the physical relationship of the motels to one another. He challenges only Lehmkuhl's testimony that the videos all depicted the same person. He contends that Lehmkuhl was in no better position than the jury to make that determination.

¶ 61 Initially, to the extent Ravenell characterizes the identification testimony as expert opinion, we disagree. The line between lay opinion and expert opinion lies in whether the testimony "could be expected to be based on an ordinary person's experiences or

knowledge." *Venalonzo v. People*, 2017 CO 9, ¶ 16. And "recognizing people in videos . . . is something ordinary people do all the time without any specialized knowledge, experience, or training." *Grant*, ¶ 62. Thus, the admissibility of Lehmkuhl's testimony turned on whether it was helpful to the jury. CRE 702.

¶ 62 That is a close question, and we tend to agree with Ravenell that the testimony was improper. But we need not answer that question definitively because, assuming the testimony should not have been allowed, any error was neither obvious nor substantial.

¶ 63 On one hand, Lehmkuhl had no firsthand knowledge of the person in the videos. *See Vergari*, ¶ 19; *McFee*, ¶ 76. He was not present when the videos were taken, nor did he have any prior familiarity with Ravenell that would have made him "more likely to correctly identify" him than the jury. *McFee*, ¶ 76. Instead, Lehmkuhl appeared to base his opinion that the individual shown in the various videos was the same person exclusively on that person's clothing and general appearance. The jury was in the same position as Lehmkuhl to look at the videos and make its own determination as to whether the person in one video was the same person in another. *See id.* (holding that testimony about what the

27

defendant said in audio recording was improper because "the jury was in precisely the same position as the detective to hear and interpret the words spoken by [the defendant] on the recording").

¶ 64    On the other hand, *Grant* cuts in the other direction. As in *Grant*, Lehmkuhl viewed far more surveillance video than the jury did, reviewing and piecing together hours of video footage, of which the jury saw only a portion. *See Grant*, ¶ 66 (noting that detective watched surveillance video several dozen times). He also had a unique understanding, based on his investigation of the area, of how the various videos fit together, including where one camera's view ended and another picked up. Although Lehmkuhl did not expressly cite this information as a basis for his opinion, it arguably gave the district court "some basis" to find that he "was in a better position to identify [the individual] in the surveillance video than the jury was." *Id.* (citation omitted). Given *Grant*'s conclusion that such testimony was admissible — "even if the jury could have undertaken the same analysis," *id.* (citation omitted) — we cannot say that any error was so clear cut that the district court should have been able to avoid it without an objection. *People v. Crabtree*, 2024 CO 40M, ¶ 42; *see also People v. Cox*, 2023 COA 1, ¶ 32 ("An

28

error will not ordinarily be deemed plain when . . . a division of this court has previously rejected the argument being advanced.").

¶ 65    Moreover, even if we were to assume obvious error, that error was not substantial for the reasons stated in *McFee* and *Vergari*. As in those cases, the jury saw the surveillance videos and could make its own determination as to whether the individual in the videos was the same person. *See McFee*, ¶ 78; *Vergari*, ¶ 20. By testifying that his opinion was based on the individual's appearance in the videos, Lehmkuhl did little more than serve as a "thirteenth set of [eyes]" on that question. *McFee*, ¶ 78. The jury therefore had "no reason to accept his opinion" when it could "evaluate [the videos] for itself." *Id.* at ¶ 79; *see also Vergari*, ¶ 20 (noting that the jury was "free to disregard [the] opinion and come to its own conclusions"). That is particularly true in light of defense counsel's substantial cross-examination of Lehmkuhl on this very point. *See People v. Vasquez*, 155 P.3d 588, 595 (Colo. App. 2006). Thus, Lehmkuhl's testimony about *his* opinion did not create "the kind of prejudice that would cast doubt on the reliability of the verdict." *McFee*, ¶ 78.

## IV.    Photograph

¶ 66    Ravenell also argues that the district court abused its discretion by admitting a photograph of him with his middle fingers raised that detectives used to identify him.  He asserts that the photo was irrelevant and unduly prejudicial.  We disagree.

### A.    Additional Background

¶ 67    The photograph was admitted during the testimony of Ravenell's girlfriend at the time of the murder.  It was one of two photos detectives showed her a week after the murder to identify Ravenell.  The first photo (which is not at issue) showed Ravenell's face, while the photo in question showed most of his body, standing and facing the camera with both middle fingers raised.  Ravenell's girlfriend testified that she identified the person in the photos as Ravenell and that he was in her car on the morning of the murder.

¶ 68    Defense counsel objected to the photo as cumulative and prejudicial.  The prosecutor argued it was an identification of Ravenell that "gives a better idea of his frame instead of just a stock picture of his face."  The district court overruled the objection.

## B.    Analysis

¶ 69    The district court did not abuse its discretion under either CRE 402 or CRE 403 by admitting the photo. *See Elmarr*, ¶ 20.

¶ 70    The identity of the shooter was the primary issue at trial. The photo was relevant to identity because it was one of the two photos that detectives presented to Ravenell's girlfriend after the murder to identify Ravenell, and it was the only such photo showing Ravenell's full body. The full-body photo was important to show Ravenell's build because the face of the shooter was not clearly visible in the video footage. Although Ravenell contends there were other photos showing his build, none of those photos — all of which came from screenshots of business surveillance videos — were the ones his girlfriend had looked at to identify him. *See People v. Thompson*, 2017 COA 56, ¶ 184 ("The fact that evidence is cumulative does not, by itself, render the evidence inadmissible.") (citation omitted).

¶ 71    Moreover, the photo was not so shocking or inflammatory as to give rise to an "undue tendency to suggest a decision on an improper basis . . . such as sympathy, hatred, contempt, retribution, or horror." *People v. Allgier*, 2018 COA 122, ¶ 31 (citation omitted); *see also* CRE 403. This was a murder case in

which the jury saw video of the victim being shot in the head at close range. Even if some jurors might take offense to the photo, there is little risk of a juror finding Ravenell committed the murder because he once flipped off a camera. *See People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002) (holding that evidence did not violate Rule 403 where it was "less serious, heinous, or egregious" than other evidence presented to the jury). The photo was shown to the jury only briefly, and the district court instructed the jury that it "must not be influenced by sympathy, bias, or prejudice in reaching [its] decision." *See People v. Dist. Ct.*, 785 P.2d 141, 146 (Colo. 1990) (noting that "cautionary instructions . . . may suffice to reduce the danger of prejudice to an acceptable level") (citation omitted).

¶ 72 Giving the photo its maximum reasonable probative value and "the minimum unfair prejudice to be reasonably expected," the district court's decision to admit the photo was not an abuse of discretion. *Gibbens*, 905 P.2d at 608. For the same reasons, the admission of the photo did not violate Ravenell's constitutional right to a fair trial. *See Oaks v. People*, 371 P.2d 443, 447 (Colo. 1962).

## V. Cumulative Error

¶ 73    Ravenell asserts that even if no single error requires reversal, the cumulative effect of the errors deprived him of a fair trial. *See Howard-Walker v. People*, 2019 CO 69, ¶ 24. Under the cumulative error doctrine, "reversal is required when the cumulative effect of multiple errors and defects substantially affected the fairness of the trial or the integrity of the fact-finding process." *Owens*, ¶ 148.

¶ 74    But for there to be cumulative error, there must be more than one error. *See Daley*, ¶ 142. We have assumed only one (nonplain) error — Lehmkuhl's testimony that the individual in the surveillance videos was the same person. The cumulative error doctrine therefore does not apply. *Id.* Even if we were to also assume that the admission of the warrant evidence was harmless error — as we have considered in the alternative — the aggregate effect of those two putative errors did not deprive Ravenell of a fair trial in light of the record as a whole for the same reasons that each did not do so independently. *See Howard-Walker*, ¶ 24.

## VI. Disposition

¶ 75    The judgment is affirmed.

JUDGE FREYRE and JUDGE SULLIVAN concur.

33